IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 17, 2019

## STATE OF TENNESSEE v. RASHIDA TYQUISHA GROOMSTER

**Appeal from the Criminal Court for Davidson County**
**Nos. 2014-C-1591, 2017-B-1407  Cheryl A. Blackburn, Judge**

———————————————————

### No. M2018-00579-CCA-R3-CD

———————————————————

A Davidson County Jury in Case No. 2017-C-1591 convicted Defendant, Rashida Tyquisha Groomster, of theft of property over $1,000 in value. She also pled guilty to theft of property less than $1,000 in value in Case No. 2017-B-1407. The trial court initially imposed an effective one-year sentence to be served in confinement. However, an amended judgment was subsequently entered indicating that Defendant was to serve her effective one-year sentence on community corrections. On appeal, Defendant argues that the evidence was insufficient to support her conviction for theft of property over $1,000 in value, that the trial court improperly denied her request for judicial diversion, and the trial court erred by denying alternative sentencing. After a careful review of the record, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

David von Wiegandt, Nashville, Tennessee, for the appellant, Rashida Tyquisha Groomster.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Megan King and Jordan Hoffman, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

*BACKGROUND*

## Guilty Plea Submission Hearing, Case No. 2017-C-1591

The facts of the case as set forth by the State at the guilty plea submission hearing are as follows:

> Your Honor, in Case No. 2017-C-1591, this case actually happened on the same day as the trial case. This happened just an hour or so before the facts Your Honor heard at trial. And so on April the 19th of 2017, around noon, [Defendant] went into the Plato's Closet at 72 White Bridge Road. There, she picked up several items of clothing and concealed them in her purse and left. And I believe her codefendants may have also been present at the time as well.

## Trial, Case No. 2017-B-1407

Jeffrey Mani testified that he was working as a loss prevention investigator for Saks Fifth Avenue located in the Opry Mills Mall on April 19, 2017, when he heard an announcement over the radio that three women were running out of the store with merchandise. Mr. Mani looked up at the surveillance monitor in the security office, which showed the entrance from the store into the mall, and he saw three women, later identified as Defendant, Mykoiya Daly, and Defendant's sister, Rashika Groomster, running out of the store. There were "stacks of items in their hand." Mr. Mani testified that he could not tell from the monitor what specific clothing items that the three women were carrying. He said that the assistant store manager, Kimberly Sanders, was running after Defendant, Ms. Daly, and Rashika Groomster, who were heading toward a mall exit into the parking lot. Mr. Mani ran to the front of the store in an attempt to intercept the three women; however, they ran out into the parking lot and entered a waiting vehicle. He saw a total of five people in the vehicle. Mr. Mani then saw an unmarked police car with its emergency lights on approach the vehicle in the parking lot, and the driver immediately pulled over. Mr. Mani informed the officer that the occupants of the vehicle had stolen merchandise from the Saks Fifth Avenue Store. He said that jean shorts with the tags still attached were recovered from the vehicle.

Mr. Mani later reviewed the video from the store's surveillance camera and saw Defendant, Ms. Daly, and Rashika Groomster enter the store and casually walk through the store, "around shoes, and then into the women's department where they approached the large long table with different jean shorts on them, and then each of them grabbed a stack; and then I think that's when Ms. Sanders saw them and started running after them." Mr. Mani testified that he saw the three women exit the mall with the clothing,

and he never saw them pay for the merchandise. He said that there were a total of thirty-three items stolen with a value of $1,479.67 before tax.

Ms. Sanders testified that at approximately 1:30 p.m. on April 19, 2017, she observed three women shoplifting in the store. Ms. Sanders admitted that she was unable to get a good look at the women's faces to be able to identify them again. Concerning the circumstances of the offense, Ms. Sanders testified:

> I was in the department straightening up close to the mall entrance. Periodically, just want to keep looking around at the area. Saw three individuals running towards the mall entrance, which I was parallel to, obviously know now that they're about to exit the building. They [were] running at full speed. The store sensormatic went off. I took off after them.

Ms. Sanders testified that all three women had denim shorts in their hands, and they ran out into the mall toward the exit into the parking lot. Ms. Sanders said that she chased the women into the parking lot "almost past the main roadway into like the first part of the parking lot of the store, in front of my store." Ms. Sanders noted that she communicated with Mr. Mani and others by radio while she was chasing the individuals.

Ms. Sanders testified that there was an undercover Metropolitan Nashville police officer in an unmarked vehicle in the parking lot who saw her chasing the three women. The officer activated his blue lights and took over the pursuit. Mr. Mani was also in the parking lot at the time. Ms. Sanders testified that Mr. Mani and the officer returned the stolen merchandise to her, and she scanned it through a cash register to make a record of the items that were taken and to determine the value of each item. Ms. Sanders testified that the total value of the items before tax was $1,479.67, and the total after tax was $1,616.49. Ms. Sanders noted that each pair of shorts still had the price tag and security tag attached to them.

Officer Brandon Whittaker of the Metropolitan Nashville Police Department testified that he was working on April 19, 2017, as a "Hermitage day flex officer" assigned to the Opry Mills Mall. He explained that the "flex team consisted of six officers and one sergeant. They use crime maps to determine my [daily] activities." Officer Whittaker testified that he was assigned to the Opry Mills Mall primarily to detect and apprehend shoplifters. Officer Whittaker testified that he was sitting in the mall parking lot in his unmarked patrol car on April 19, 2017, looking for "suspicious vehicles and persons." There were other officers walking around inside the mall. At approximately 1:30 p.m. he noticed three females running from the main entrance of the mall. He testified:

Each female came running out with just armloads full of clothing. I couldn't really tell what it was, but I knew that there was clothing without shopping bags. Shortly behind them was the [loss prevention officer] for Saks Fifth Avenue chasing behind. I turned on my blue lights to get their attention to let them know that I was the police and I was coming for them. And as I rolled past the security, the [loss prevention officer], he explained that they stole the items.

Officer Whittaker identified the three women running from the mall as Defendant, Ms. Daly, and Rashika Groomster. He said that the three women got into a silver Ford Focus with the clothing. He saw Ms. Daly get into the front passenger seat, Rashika Groomster got into the center of the back seat, and Defendant got into the passenger side back seat. Officer Whittaker testified that there "were two other individuals inside the vehicle – one in the driver seat, Brianna something or another," and the mother of Defendant and Rashika Groomster was in the back seat on the driver's side. Officer Whittaker activated his blue lights and siren, and the driver of the car pulled over. He said:

> It pulled to the side on the little service road that runs parallel with Briley Parkway. I noticed a lot of movement in the back seat of the vehicle, which was [  ] Rashika [Groomster] trying to get out of the vehicle. She was stumbling over the others in the vehicle. She made it out of the back passenger side of the vehicle and started to run toward Briley Parkway.

Using his patrol car's PA system, Officer Whitaker, advised Rashika Groomster that she was under arrest and to stop running. However, Rashika Groomster continued running across six lanes of interstate traffic. Defendant and the other women remained inside the car and were cooperative. Officer Whittaker observed the stolen items of clothing inside the vehicle. He was later notified that Rashika Groomster had been taken into custody by another officer. Officer Whittaker testified that he transported Ms. Daly in his patrol car after her arrest, and she admitted that she "went into the store, grabbed items off of the open table and ran out of the store from [the loss prevention officer]." Defendant also told Officer Whittaker that "she was going to be real with me, that she also grabbed items from the table and stole them and ran out of the store." Officer Whittaker never spoke with Rashika Groomster.

The jury returned a verdict of guilty as to Defendant on February 13, 2018.

*Sentencing Hearing*

Officer Nicholas Smith of the Metropolitan Nashville Police Department testified that at approximately 8:33 a.m. on March 8, 2018, he was dispatched to the apartment of

Defendant and Rashika Groomster. The call involved a domestic violence incident between Defendant and her boyfriend, Ferrari Malone. Defendant claimed that Mr. Malone pointed a gun at her, broke her phone, injured her arm, and prevented her from calling 911.

Mr. Malone was already gone when Officer Smith and other officers arrived on the scene, and they searched for him. The officers eventually went back to the apartment and were standing outside. Officer Smith testified that he heard arguing inside the apartment. He said, "It was getting louder, more sharp. I asked them to calm down. No one responded." Officer Smith noted that LaFrieda Harris was also in the apartment in addition to Defendant and Rashika Groomster. Officer Smith testified that he knocked on the apartment door and entered the home. He saw all three of the women inside arguing, and Defendant "was in Ms. Harris's face. Their noses were nearly touching. They were yelling at each other." Officer Smith then observed Defendant "back away, take a can of pepper spray from her purse and then advance back on Ms. Harris." He said that Defendant had her finger on the button of the pepper spray, and the can was down to her side. Officer Smith grabbed Defendant and placed her on the ground, and she was taken into custody. Officer Smith testified that he charged Defendant with assault of Ms. Harris and domestic assault against Rashika Groomster. He said that Rashika Groomster told him that the argument occurred because Defendant had pepper sprayed her boyfriend, and "Ms. Rashika [Groomster] was not impressed by that, which caused [Defendant] to push her, which then led Ms. Harris to come to Ms. Rashika's aid."

Defendant made the following statement of allocution as to the felony theft case for which she was convicted.

> Uh, I understand my wrongdoings, yet I was in the wrong. I'm sorry is something I can say, yet I cannot always use my ignorance as a[n] excuse. I can and I will admit I was in the wrong for stealing. I have to realize I have kids who need me, yet I have made many decisions and wish I could take them back. I'm just asking for another chance to be a great mother to my children and teach them a better way of life than to see me in jail like I see my mom and dad at that age. It took me going to jail to realize, and to sit in jail and realize this is where I do not want to be.
>
> Once again, I take full responsibility for my actions and the part I played in the crime I did. I just come to you asking for another chance. Even though I messed up, it will not happen again. Come asking for a fair sentence and hopefully just a little time serve for my actions on both crimes.

The trial court then asked the prosecutor about Defendant's charge for shoplifting in Atlanta, Georgia. The prosecutor noted that "it was currently bound over" and that Defendant was considered to be on bond there.

*Analysis*

## I.  Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support her conviction for theft over $1,000 because Defendant and "her co-defendants each committed a separate theft, and the conviction should have been theft under $1,000." We disagree.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

T.C.A. § 39-14-103(a) states, "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result" and "acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id*. § 39-11-302(a), (b). The

aggregate value of stolen property in multiple thefts may be used to support the grade of the theft offense "when separate acts of theft are: (1) from the same owner; (2) from the same location; *and* (3) are pursuant to continuing criminal impulse or a single sustained larcenous scheme." *State v. Cattone*, 968 S.W.2d 277, 279 (Tenn. 1998) (citing *State v. Byrd*, 968 S.W.2d 290 (Tenn. 1998) (emphasis in original). Theft of property valued at $1000 or more but less than $10,000 is a Class D felony. *Id.* § 39-14-105(a)(3).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). As pertinent to this case, a person is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" T.C.A. § 39-11-402(2). Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)).

"[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

Viewing the evidence in a light most favorable to the State, the proof showed that on April 19, 2017, Defendant, Rashika Groomster, who is Defendant's sister, and Mykoiya Daly, Defendant's cousin, walked together into the Saks Fifth Avenue store in the Opry Mills Mall and over to a table with different styles of jean shorts on it. Each of the three women took a stack of the shorts and ran out of the store. Mr. Mani, a loss prevention officer, and Ms. Sanders, the assistant store manager, chased the three women who ran out of the store to a mall exit and into the parking lot where they all got into the same waiting vehicle. Defendant's mother was also inside the car along with the driver. The driver of the car attempted to leave the parking lot but was pulled over by Officer Brandon Whittaker. Officer Whittaker had seen Defendant, Ms. Daly, and Rashika Groomster run from the mall with "just armloads full of clothing without shopping bags." He observed the stolen items of clothing inside the vehicle. Ms. Daly admitted to Officer Whittaker that she "went into the store, grabbed items off of the open table and ran out of the store from [the loss prevention officer]." Defendant also told Officer Whittaker that she was going to be "real" with him and admitted that she "also grabbed items from the table and stole them and ran out of the store." Officer Whittaker never spoke with

Rashika Groomster because she ran from the scene and was later apprehended by another officer. Ms. Sanders testified that the value of the shorts taken by Defendant, Ms. Daly, and Rashika Groomster totaled $1,479.67 before tax and $1,616.49 after tax.

From this proof, a reasonable trier of fact could find that Defendant acted together with Ms. Daly and Rashika Groomster and that they assisted each other in stealing merchandise worth more than $1,000 from Saks Fifth Avenue. Additionally, Defendant obviously intended to benefit from the proceeds of the offense. Defendant knowingly and voluntarily shared in the criminal intent of the crime in this case, and she promoted its commission. *Maxey*, 898 S.W.2d at 757. The evidence was sufficient to support Defendant's conviction for theft of property over $1,000.

## II. Denial of Judicial Diversion

Defendant argues on appeal that the trial court should have granted judicial diversion. In *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012), the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708. This standard of review extends to alternative sentences as well as decisions involving judicial diversion. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) ("[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence."); *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014)("the abuse of discretion standard accompanied by a presumption of reasonableness applies to all sentencing decisions, including the grant or denial of judicial diversion, when the trial court properly supports its decision on the record in accordance with the purposes and principles of sentencing"). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court imposes a sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

Tennessee Code Annotated section 40-35-313 outlines the requirements for judicial diversion. After a qualified defendant is either found guilty or pleads guilty, a trial court has the discretion to defer further proceedings and place that defendant on probation without entering a judgment of guilt. T.C.A. § 40-35-313(a)(1)(A). A qualified defendant is defined in relevant part as a defendant who:

> (a) [i]s found guilty of or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought;
>
> . . .
>
> (c) Is not seeking deferral of further proceedings for a sexual offense, a violation of § 71-6-117 or § 71-6-119, driving under the influence of an intoxicant as prohibited by § 55-10-401, vehicular assault under § 39-13-106 prior to service of the minimum sentence required by § 39-13-106, or a Class A or B felony;
>
> (d) [h]as not previously been convicted of a felony or a Class A misdemeanor for which a sentence of confinement is served; and
>
> (e) [h]as not previously been granted judicial diversion under this chapter or pretrial diversion.

T.C.A. § 40-35-313(a)(1)(B)(i).

Eligibility for judicial diversion does not entitle the defendant to judicial diversion as a matter of right. *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). Rather, the statute states that a trial court "may" grant judicial diversion in appropriate cases. *See* T.C.A. § 40-35-313(a)(1)(A). When making a determination regarding judicial diversion, the trial court must consider the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's mental and physical health, (6) the deterrent effect of the sentencing decision to both the defendant and other similarly situated defendants, and (7) whether judicial diversion will serve the interests of the public as well as the defendant. *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing *Parker*, 932 S.W.2d at 958). The record must reflect that the trial court considered and weighed all these factors in arriving at its decision. *Electroplating, Inc.*, 990 S.W.2d at 229 (citing *State v. Bonestel*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), overruled on other grounds by *State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000)).

As noted above, our supreme court in *King* has concluded that the proper standard of review for judicial diversion decisions is that established in *Bise*. The *King* Court explained,

[W]hen the trial court considers the *Parker* and *Electroplating* factors, specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion, the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision. Although the trial court is not required to recite all of the *Parker* and *Electroplating* factors in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it. Thereafter, the trial court may proceed to solely address the relevant factors.

If, however the trial court fails to consider and weigh the applicable common law factors, the presumption of reasonableness does not apply and the abuse of discretion standard, which merely looks for "any substantial evidence" to support the trial court's decision, is not appropriate. . . . In those instances, appellate courts may either conduct a de novo review or, if more appropriate under the circumstances, remand the issue for reconsideration.

*King*, 432 S.W.3d at 328-29 (internal citations omitted) (footnote omitted).

The trial court in this case made the following findings concerning judicial diversion:

Now, with regard to 40-35-313, [Defendant] is technically eligible. But looking at some of the factors I need to look at is her behavior while she's been out on bond, any prior records, and her social things, whether, you know, new arrest situation. Obviously, she had an extremely bad childhood. She has some mental health issues. There's no question about that. She also has other, even though she wasn't convicted of any felonies as a juvenile, she certainly had some misdemeanors involving theft. So it looks like shoplifting, and this is a shoplifting case. So that's something I want to consider as to whether or not she really is deserving of the 40-35-313. And she finds herself in custody today because she can't control herself while she's at home with her sister, while the police are there.

So I'm not going to grant her the 40-35-313.

We find that the trial court did not make all of the necessary findings on the record with respect to judicial diversion. The trial court perfunctorily said that it was "looking at some of the factors [it] need[ed] to look at." As stated above, the trial court also said it needed to look at Defendant's "behavior while she's been out on bond, any prior records,

- 10 -

and her social things, whether, you know, new arrest situation." The court further noted that Defendant had "an extremely bad childhood" and "some mental health issues." The trial court did not discuss on the record at the sentencing hearing or in any written order how the factors that it considered weighed in favor or against the granting of judicial diversion. *See Bonestel*, 871 S.W.2d at 168 (Tenn. Crim. App. 1993)(in a denial of judicial diversion, the trial court must make "more than an abstract statement in the record that [the trial court] has considered [the *Parker* and *Electroplating* factors]"), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000). Therefore, we will employ de novo review of the trial court's decision to deny judicial diversion.

At the sentencing hearing in this case, Defendant did not present any proof demonstrating that she was an appropriate candidate for judicial diversion. Trial counsel's entire argument at the sentencing hearing consisted of the following statement:

> And we would ask for 40-35-313. She is eligible. The certificate has been added as an exhibit. She has expressed in her Presentence Report her desire to go back to school. That would be an appropriate condition of probation, to her HISET [High School Equivalency Test]. She's working with [Department of Children's Services] and Centerstone to get custody of her children and to get appropriate housing. And we submit that jail time and any further convictions on her record would go against those efforts.

> So that's what we're asking, probation, mental health court probation, 40-35-313.

> And one thing I also forgot to mention is based on her social history, which also goes to 40-35-313. I'm not going to read through it all, but [Defendant] did not have the best upbringing, and she is making changes, not the fastest pace, but that also goes to 40-35-313.

In this case, Defendant has a prior conviction for violating a restraining order. Her juvenile record indicates that she was adjudicated delinquent on four counts of theft, three counts of trespassing, and a single count of disorderly conduct. Defendant also admitted in the presentence report that she used marijuana "a lot" from 2015 until October 2017. However, Defendant did not believe that she had a problem with marijuana and that it was just "weed." She said that she stopped using marijuana as a condition of her bond and for her children. The presentence report reflects that Defendant had a charge for theft up to $1,000 in Atlanta, Georgia, with an offense date of September 4, 2017, and an "unknown status." She also had an open case in Davidson County for shoplifting with an offense date of January 6, 2018. Additionally, Defendant was arrested on March 8, 2018, for domestic assault on her sister and assault on her sister's friend, committed in the presence of police officers, three weeks and two days after her conviction in this case.

The "STRONG-R Needs Report," an assessment tool, indicated that Defendant was at a high risk for property crime.

As for Defendant's social history and mental health, the trial court noted that Defendant had an "extremely bad childhood." In the presentence report Defendant stated that both of her parents were "in and out of jail throughout her life" and that she was raised by her great aunt. Her mother was currently incarcerated on a community corrections violation. Defendant indicated that her mother abused her, and her uncle's best friend raped her when she was eight years old. At the time of the offenses in this case, Defendant was living with her sister who was one of her accomplices. Defendant indicated that her boyfriend was a positive influence but that he had been on probation. Defendant did not complete high school, and her employment history consisted of a single month working for a temporary agency when she left due to pregnancy. Her two young children were in the custody of the Department of Children's Services (DCS). Defendant reported a history of mental illness, which included a diagnosis of bipolar at the age of eight. She indicated that she spent a month in inpatient care at the age of sixteen after she attempted suicide. Defendant reported that she was using valium at the time of the present offenses.

We conclude that Defendant's criminal history, social history, and her mental health all weigh against the granting of judicial diversion and outweigh any other factors that might weigh in favor of granting diversion. Her criminal history reflects poorly on her amenability to correction weighs heavily against granting her judicial diversion. As such, based on our de novo review, we affirm the denial of Defendant's request for judicial diversion. Defendant is not entitled to relief on this issue.

### III. Alternative Sentencing

Defendant contends that she "should have been given an alternative sentence." However, the record reflects that Defendant was in fact granted an alternative sentence by the trial court. At the conclusion of the sentencing hearing on March 21, 2018, the trial court stated:

> Whether or not an alternative sentence is available, at this point, because she's in custody, she's got the charge pending in Atlanta, I don't think it's an appropriate thing to suspend her sentence at this point. However, I will say this. Because she has not been on probation previously, and this involves a lot of complicated things for her, [defense counsel], I would advise you to get a DDS evaluation of her and let's see if they can come up with a program, in which case I'll consider it.
>
> So, right now, she's going to need to serve the sentence. But I think she might be eligible for the DDS program. That would be a good thing for

her, given the mental health issues. So if you can have her evaluated, just let me know.

The technical record contains the minutes from a hearing held on April 13, 2018, which states the following: "THEREUPON, THIS CAUSE CAME TO BE HEARD BY THE COURT UPON AN ORAL MOTION TO SUSPEND SENTENCE; AFTER DUE CONSIDERATION AND ALL THE EVIDENCE INTRODUCED, SAID MOTION IS GRANTED WITH DEFENDANT PLACED ON BALANCE OF SENTENCE ON COMMUNITY CORRECTIONS." An amended judgment was also entered which reflected that Defendant was sentenced to "community corrections – DDS – must live [with] aunt." Community corrections is a form of alternative sentencing. *State v. Decornick Moore*, No. W2015-00169-CCA-R3-CD, 2015 WL 5048970, at \*3 (Tenn. Crim. App. Aug. 26, 2015); *State v. Cindy Mae Nelson*, No. E2010-01288-CCA-R3-CD, 2011 WL 1642638, at \*4 (Tenn. Crim. App. April 29, 2011). Therefore, Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE